IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 2:13-cr-67 |
| KEITH JERMAINE EVERETT, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

In light of the novel coronavirus and the COVID-19 pandemic, defendant seeks early

termination of his prison term under the compassionate release provision in 18 U.S.C.

§ 3582(c)(1)(A)(i).  In summary, using compassionate release in this case would fail to address a

range of important practical and legal problems and would not satisfy the standards in

§ 3582(c)(1)(A).  As set forth in greater detail below, the Court should deny defendant's motion

because (1) he has failed to present sufficient evidence that he exhausted his administrative

remedies, (2) he does not have a medical condition that qualifies as an "extraordinary and

compelling" reason for release,[1] (3) he presents a serious risk of recidivism based on his age at the

time he committed the offense of conviction and his disciplinary record while incarcerated, (4) the

statutory sentencing factors in 18 U.S.C. § 3553(a) weigh against release, and (5) his release plan

fails to account for the fact that he would be at greater risk of contracting COVID-19 if released into

the local Norfolk community than he would serving the remainder of his sentence at Yazoo City

Low FCI in Yazoo City, Mississippi.

---

[1] While the defendant claims that he suffers from Type 2 diabetes mellitus and obesity, his current medical records do not show that he presently suffers from either condition. The defendant also claims he suffers from high blood pressure and high cholesterol, however, his medical records show that these conditions are being well managed through medication, diet and exercise. The strength of defendant's claims will be addressed in greater detail below.

## I. BACKGROUND

### A. Procedural Background

On February 12, 2013, the defendant was charged by criminal complaint with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(ii). ECF No. 1. On May 29, 2013, defendant pled guilty to the same charge in a one-count criminal information, and sentencing was set for August 27, 2013. ECF No. 16, 17.  On August 27, 2013, the defendant was sentenced to 188 months and five years of supervised release. ECF No. 29. The defendant's sentence was later reduced to 94 months by the Court on an unopposed motion. Defendant's conviction in the instant case resulted in a supervised release violation in case number 2:02-cr-172 on May 31, 2013.  At that time, United States District Judge Rebecca Beach Smith sentenced the defendant to an additional 42 months in prison.[2] Therefore, the defendant is currently serving a combined sentence of 136 months, and he has been in custody since April 16, 2013, therefore, he has served 93 months (roughly 68%) of his sentence. The defendant is presently 41 years old and his anticipated release date is January 15, 2023, according to the Bureau of Prisons Inmate Locator.

The defendant claims in his motion that he applied to the Warden of Yazoo City Low FCI for compassionate release on October 28, 2020 (ECF No. 55, p. 3), however the Administrative Remedy record provided by the Bureau of Prisons (BOP) does not reflect any submissions. *See* Exhibit 3. Further, according to information received from BOP, the defendant is not being considered for home confinement under the CARES Act due to a history of violence and a PATTERN score of high risk recidivism level.

### B.  Factual Background

From the early spring of 2011 until April of 2013, the defendant was responsible for obtaining and distributing large amounts of marijuana and cocaine, and smaller quantities of heroin

---

[2] The defendant filed his compassionate release motion under the above-captioned case number only.

in Norfolk, Virginia and surrounding jurisdictions. According to three cooperating witnesses, the defendant dealt regularly in pound-quantities of marijuana, and also obtained ½ kilograms of cocaine monthly which he broke down and distributed in smaller (multiple ounce) quantities during this period. Presentence Report ¶¶5, 8-15 (hereinafter, "PSR ¶ __"). At sentencing, the defendant was attributed with 19.5 kilograms of cocaine, 19.4 kilograms of marijuana, and 56.7 grams of heroin. PSR ¶16.

At the time these offenses were committed, the defendant was age 32-33. *See* PSR Identifying Data, p. 2. In addition, at the time these offenses were committed, the defendant was on state supervised probation (after previously violating probation on an underlying conviction for possession with intent to distribute cocaine in April 2004), *and* federal supervised release for a prior federal drug conviction for conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine base in January of 2003.  PSR ¶¶33, 35, and Worksheet C, ¶5. Finally, at the time these offenses were committed, the defendant was living with his mother on Alexander Street in Norfolk (PSR ¶57), the same person he now proposes to reside with on home confinement if the Court were to grant his request. ECF No. 55, p. 13.

## II.  <u>SUMMARY OF ARGUMENT</u>

Defendant filed the instant motion on January 4, 2021, claiming his medical conditions and the conditions at his facility pose an extraordinary and compelling reason for his release based on the COVID-19 pandemic. While defendant claims he filed an "electronic request" for compassionate release with the warden of his facility on October 28, 2020, he has not provided any supporting documentation of this request, nor does he provide the specific basis or arguments he presented to the warden. ECF No. 55, p.3. Thus, the defendant has failed to provide sufficient evidence that he has exhausted his administrative remedies with the BOP.

Defendant claims he presently suffers from diabetes mellitus (Type II), obesity, high blood pressure, and high cholesterol. However, as explained in greater detail in Section III.E below, defendant's BOP medical records for 2019-2020 do not show a diagnosis of obesity, and only refer

to a "history" of diabetes.[3]  In fact, on May 19, 2019, after reviewing the defendant's lab work, Dr. Richard Griffin noted that the defendant "does not have DM" (referring to diabetes mellitus), and recommended that he be removed from the Chronic Care Clinic. *See*, Exhibit 1, p. 7. Finally, the defendant's two other health conditions, high blood pressure and high cholesterol, are being properly addressed by BOP medical staff through appropriate medication and counseling concerning diet and exercise, therefore they do not constitute an extraordinary and compelling reason for compassionate release.

Defendant's proposed release plan is not viable for several reasons. First, he proposes to live with his 61-year-old mother in Norfolk (no address provided), if released on home confinement. The United States respectfully submits that this plan is problematic because she has a history of drug abuse and addiction, and he was living with her when he committed the instant offenses in 2011-2013. Secondly, defendant fails to explain how he would be less likely to contract COVID-19 while living in a residence in Norfolk than in his present facility where there is only two cases of COVID-19 amongst the inmates. In summary, the defendant's release plan will not sufficiently protect the public, and it also fails to account for the fact that he is at less risk for contracting the virus by remaining in his prison facility.

Finally, the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh heavily against granting compassionate release, based on the defendant's offense conduct, the fact that he was on supervised release at the time he committed the instant offenses, his disciplinary record while incarcerated, and his lengthy serious criminal record.

### III.  ARGUMENT

### A. BOP efforts to mitigate the effects of COVID-19

Since the onset of the COVID-19 pandemic, BOP has adopted measures to contain the

---

[3] The defendant's medical records for 2019 and 2020 will be filed separately under seal as Exhibits 1 and 2, (respectively). Exhibit 1 consists of 27 pages and Exhibit 2 consists of 51 pages. These records are organized chronologically, but are not paginated sequentially, therefore the United States is citing to the .pdf page numbers for easier reference.

spread of the virus within prisons.  In appropriate cases, BOP has released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[4]  BOP has also begun vaccinating inmates and staff.  Further, BOP has limited access to prisons, restricted prisoner movement within prisons, required screening and testing, provided masks and hand cleaners, separated ill inmates from the rest of the population, and educated inmates and staff on preventing the spread of disease.

Before Congress enacted the CARES Act, § 3624(c)(2) authorized BOP to "place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  As part of the CARES Act, Congress sought to address the spread of COVID-19 in prisons by temporarily authorizing BOP to expand the use of home confinement under § 3624(c)(2).  Accordingly, during the coronavirus emergency, the Act suspends the limitation that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, provided that the Attorney General finds that "emergency conditions will materially affect the functioning" of BOP.[5]  CARES Act § 12003(b)(2).  The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement. *https://www.justice.gov/file/1266661/download*.

BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable for home confinement."  *https://www.bop.gov/coronavirus/* (last visited January 28, 2021).  There are currently 7,837 inmates on home confinement, and the BOP has placed a total of 21,067 inmates in home confinement since March 26, 2020.  *Id.*

Inmates do not have to apply to be considered for home confinement.  BOP considers such

---

[4] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).
[5] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

factors as the "age and vulnerability of the inmate to COVID-19," consistent with CDC guidelines; the security level of the inmate's facility, giving priority to those in low and minimum security facilities; the inmate's conduct while in prison; whether the inmate has a release plan "that will prevent recidivism and maximize public safety"; and the "danger posed by the inmate to the community."  Memorandum from Attorney General to BOP Director 1–2 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. Additionally, BOP must assess the inmate's risk factors and grant home confinement only after determining that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." *Id.* at 2.  To protect the public against further spread of the coronavirus, BOP requires every inmate granted home confinement to quarantine for 14 days before his release.  *Id.*

BOP has also begun administering vaccines to inmates and staff.  After offering the vaccine to all employees, institutions will give priority to inmates assigned to work in health service units and inmates in nursing care centers or other residential care units.  *COVID-19 Vaccine Guidance*, BOP 6 (Jan. 4, 2021), www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Next, priority is given to inmates age 65 or older and inmates of any age who, based on CDC criteria, "are at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  *Id.*  The third level of priority for vaccine administration includes inmates between 50 and 64 years old and inmates of any age who, based on CDC criteria, "might be at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  *Id.* at 7.  Vaccines will then be available to all other inmates.  *Id.*

BOP is also operating under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to socially distance.[6] Common areas are sanitized multiple times per day.  *Id.* at 3.

---

[6]*Correcting Myths and Misinformation About BOP and COVID-19*, (May 6, 2020), bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf, (cited as "*Correcting Myths…*").

Additionally, medical staff screen every newly admitted inmate for COVID-19.  *BOP Modified Operations*, (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.  Inmates who are asymptomatic and test negative are placed in quarantine for 14 days.  *Id.*  Inmates who are symptomatic and/or test positive are placed in medical isolation.  *Id.*

Medical staff also conduct rounds and check inmate temperatures at least daily.  *See*, footnote 6, *Correcting Myths*, at 1.  Inmate movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones.  Movement is also still permitted for mental health and medical care.  *Id.*

Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days and test negative before transfer.  *Id.*  BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary."  *Id.*  For immediate releases where the inmate could not quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary.  *Id.*

BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities.  *Id.*  Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building.  *Id.*  Staff who exhibit symptoms are sent home. *Id.*, at 3.  BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space.  *BOP Modified Operations*.  Visits are "non-contact" and must be socially distant, either using physical barriers such as plexiglass or physical distancing.  *Id.*  Inmates in quarantine or isolation cannot participate in visits.  *Id.*  Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry.  *Id.*  Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene

before and after the visit.  *Id.*  Volunteer visits and tours have been suspended.  *Id.*  Contractors may access BOP facilities to perform "essential services, religious worship services, or necessary maintenance on essential systems," but must complete a COVID-19 screening and temperature check before entry.  *Id.*   Additionally, BOP has published extensive guidance to all staff and established a 24/7 hotline to answer staff questions about the virus.  *Correcting Myths*, at 2.

### B.  Conditions at the defendant's facility

Yazoo City Low FCI has a total of 1,377 inmates.  As of January 28, 2021, 2 inmates and 5 staff members are positive for COVID-19 at the facility, and 83 inmates and 9 staff members who previously tested positive for COVID-19 and have since recovered. Three inmates and zero staff members at the facility have died from COVID-19.

Consistent with CDC guidance, the BOP has begun administering vaccines to inmates and staff at Yazoo City Low FCI.  Yazoo City received the first shipment of vaccine doses the week of January 11, 2021.  Available doses were offered to all staff who wanted it, and the remaining doses were then offered to inmates on a priority basis.  Defendant was not one of those inmates in the higher priority category presumably because of his age and stable health.  The institution will receive a second shipment of doses, which will only be for the staff and inmates who received the first dose.  At this time it is unknown when the institution will be receiving any additional shipments of the vaccine. As noted above, according to information received from BOP, defendant is not being considered for home confinement under the CARES Act due to a history of violence and a PATTERN score of high risk recidivism level.

### C.  Exhaustion

Section 3582(c)(1)(A) provides two avenues by which a court may modify a term of imprisonment—a motion by the Director of BOP or a motion by a defendant.  When a defendant initiates the motion, the defendant must exhaust administrative review.  The statute confirms that, following the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, "defendants now may

bring reduction-of-sentence motions on their own once they exhaust any administrative remedies or wait 30 days from the date they request relief from the Bureau of Prisons." *United States v. Ruffin*, 978 F.3d 1000, 1004 (6th Cir. 2020). Before they do so, however, they "must at least ask [BOP] to do so on their behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

The statutory exhaustion requirement is a mandatory, non-jurisdictional claims-processing rule. *See United States v. Williams*, 829 F. App'x 138, 140 (7th Cir. 2020); *United States v. Franco*, 973 F.3d 465, 468 (5th Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791–92 (10th Cir. 2020); *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020); *Raia*, 954 F.3d at 597; *see also*, *e.g.*, *United States v. Beahm*, No. 1:05-CR-249, 2020 WL 4514590, at *1 (E.D. Va. Aug. 5, 2020). This requirement serves an important purpose: it "provide[s] BOP with the first opportunity to evaluate a prisoner's request," consistent with Congress's determination that "BOP, not the Court is better positioned to first evaluate a defendant's request and consider whether modification of a term of imprisonment is appropriate." *Beahm*, 2020 WL 4514590, at *1. Further, requiring defendants to seek relief first with BOP "ensures that prison administrators can prioritize the most urgent claims" and "can investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist." *Alam*, 960 F.3d at 835.

It follows that a defendant must present the same claims in support of compassionate release to BOP that he presents to the Court. *See, e.g.*, *Springer*, 820 F. App'x at 791; *United States v. Knight*, No. 1:15-CR-393, 2020 WL 4059886, at *2 (M.D.N.C. July 20, 2020) (collecting cases). Otherwise, "[a]llowing an inmate to present the Court with an entirely new basis for a sentence reduction denies [BOP] the opportunity to evaluate the request on its merits and undermines the mandatory statutory exhaustion requirement." *Knight*, at *2.

### (i). The defendant failed to exhaust his administrative remedies with BOP.

The defendant has not satisfied either method of exhaustion under § 3582(c)(1)(A).

The first avenue requires the defendant not only to submit a request to the warden, but also to "exhaust all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." § 3582(c)(1)(A). In other words, under this provision, it is not enough for a defendant simply to receive a denial of his request from the warden. Instead, the defendant must exhaust "all" administrative rights to appeal. *See* 28 C.F.R. § 571.63 (specifying when a decision by BOP on compassionate release constitutes a final administrative decision).

The second way to satisfy the exhaustion requirement is by filing a motion in district court after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." § 3582(c)(1)(A). This language could be read to require that, when an inmate files a premature motion during the 30-day period, a court must dismiss the motion and require the inmate to refile the motion after the 30-day period has passed. *See, e.g., United States v. Ward*, No. 20-60665, 2020 WL 7755453, at *1 (5th Cir. Dec. 29, 2020) (per curiam). But, to the extent that the statutory language could be read that way, the exhaustion provision is not jurisdictional, *see Franco*, 973 F.3d at 467– 68; *Alam*, 960 F.3d at 833, and the government may choose not to assert the requirement to avoid what could otherwise turn into an empty exercise in refiling pleadings.

Because there are two alternative means to satisfy the exhaustion requirement, and an inmate may file after "whichever" event occurs "earlier," § 3582(c)(1)(A), a defendant may rely on the 30-day period even if the administrative appeals process is not complete. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (per curiam) (agreeing with the government's concession that an inmate may file a motion in court 30 days after presenting his request to the warden, regardless of whether the administrative process is complete).

In this case, defendant has not satisfied the exhaustion requirement because he has not established that he sent a request for compassionate release to the warden (nor the basis for that request), so that this Court can evaluate the same request on its merits. *See Knight, supra*.

(ii).    **The exhaustion requirement of § 3582(c)(1)(A) is mandatory and cannot be waived.**

The text of § 3582(c)(1)(A) imposes a mandatory exhaustion requirement that permits no exceptions.  *See, e.g.*, *Franco*, 973 F.3d at 468; *Alam*, 960 F.3d at 833–34; *Williams*, 829 F. App'x at 140.  This interpretation is consistent with Supreme Court and Fourth Circuit precedent holding that mandatory, statutorily-imposed exhaustion requirements do not leave room for exceptions.  *See, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("[M]andatory exhaustion statutes like the [Prison Litigation Reform Act] establish mandatory exhaustion regimes, foreclosing judicial discretion."); *see also Germain v. Shearin*, 725 F. App'x 225, 227 (4th Cir. 2018) ("Courts may not excuse an inmate's statutory duty to exhaust administrative remedies." (citing *Ross*, 136 S. Ct. at 1856–57)).  That is because "'Congress sets the rules' when it comes to statutory exhaustion requirements," such that "the judiciary has a role to play in exception-crafting 'only if Congress wants [it] to.'"  *Alam*, 960 F.3d at 834 (quoting *Ross*, 136 S. Ct. at 1857).  Where, as here, the statutory text is clear, the Court must enforce the exhaustion requirement.

As an initial matter, the Supreme Court has rejected policy arguments in interpreting clear legislative language.  *See, e.g.*, *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) ("Even if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our 'primary guide' to Congress' preferred policy.").  Just as "the word 'shall' usually creates a mandate, not a liberty," *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018), the phrase "[t]he court may not modify" in § 3582(c) imposes a mandate against judicial action and does not confer discretion.  *Cf. McNeil v. United States*, 508 U.S. 106, 111, 113 (1993) ("The command that an 'action shall not be instituted ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail' is unambiguous. We are not free to rewrite the statutory text.").

Cases waiving the mandatory exhaustion requirement overlook another important

11

consideration.  To address the problems created by the coronavirus pandemic, Congress enacted the CARES Act, which included a specific provision designed to mitigate the spread of the virus in prisons.  Specifically, § 12003(b)(2) of the CARES Act expanded BOP's authority under § 3624(c)(2) to release inmates on home confinement.  At the same time, however, Congress did not alter the exhaustion requirement in § 3582(c)(1)(A).  The Court must assume that Congress was aware of this exhaustion requirement after having amended § 3582(c)(1)(A) as part of the First Step Act of 2018.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1979) ("It is always appropriate to assume that our elected representatives … know the law[.]"); *accord Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("We must assume that, when Congress amended § 2680(h) in 1974, it was aware of § 2680(a) and its contours.").  As a result, Congress's decision not to amend the exhaustion requirement as part of the CARES Act indicates that exhaustion remains a mandatory component of § 3582(c)(1)(A).  *See, e.g.*, *Morrison-Knudsen Constr. Co. v. Director, Off. Of Workers' Comp. Programs*, 461 U.S. 624, 633 (1983) (concluding, based on "evidence that Congress was aware of the significant changes in compensation practices, its willingness to amend and enact legislation in view of those changes, and its failure to amend the [Longshoremen's and Harbor Workers'] Compensation Act in the same manner" that it "did not intend" to expand the definition of "wages" under that statute).

Moreover, Congress's decision as part of the First Step Act to allow defendants to bring their own motions for compassionate release does not erode the statute's mandatory exhaustion requirement.  Although § 3582(c)(1)(A) accelerates judicial review by allowing defendants to move for relief in district court 30 days after BOP received their request, "it is unclear how the thirty-day backstop could possibly signal congressional intent to further accelerate judicial review" under this section.  *United States v. Montanez*, 458 F. Supp. 3d 146, 154 (W.D.N.Y. 2020); *see United States v. Vence-Small*, No. 3:18-cr-31 (JAM), 2020 WL 1921590, at *5 (D. Conn. Apr. 20, 2020) ("It would be anomalous to conclude that, if Congress decides to soften a plenary exhaustion requirement by allowing for an equitable exception (*e.g.*, a 30-day waiting time rule), then this

opens the door for courts to create their own exception-to-the-exception (*e.g.*, a less-than-30-day waiting time rule).").

Additionally, nothing in the legislative history of the First Step Act suggests that § 3582(c)(1)(A)'s exhaustion requirement is waivable.  At the outset, the statutory language is unambiguous, so there is no need to examine this legislative history to determine its effect on § 3582.  *See United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); *see also Mylan Pharm., Inc. v. U.S. FDA*, 454 F.3d 270, 275 (4th Cir. 2006) (declining to consult the legislative history where the appellant had identified "no textual ambiguity of the sort that would ordinarily lead [the court] to consult materials outside the statute's four corners").  Even if the Court were to consider the legislative history, it does not support the defendant's position.  The cases cited by the defendant in his brief rely on a House Report stating that the purposes of the First Step Act were to "enhance public safety by improving the effectiveness and efficiency of the Federal prison system" and to "ensure prisoner and guard safety and security."  H.R. Rep. No. 115-699, at 22 (2018).  But this statement summarizes the purposes of the First Step Act as a whole, not of any particular provision. *Montanez*, 458 F. Supp. 3d at 155.  In any event, it is "unclear that granting courts the right to waive Section 3582(c)(1)(A)'s prerequisites effectively furthers these goals."  *Id.*  After all, "[t]he BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan." *United States v. Roberts*, No. 18-CR-528-5 (JMF), 2020 WL 1700032, at *2 n.2 (S.D.N.Y. Apr. 8, 2020) (internal quotation marks omitted).

> a.  Exhaustion should not be waived because of COVID-19.

The defendant submits that the Court should waive the exhaustion requirement in this case because of the unprecedented nature of the COVID-19 pandemic. ECF No. 55, p. 6.  Although the Fourth Circuit has not yet ruled on this issue, several courts of appeals have rejected the onset of the COVID-19 pandemic as a sufficient basis to waive § 3582(c)(1)(A)'s mandatory exhaustion

requirement.  *See Williams*, 829 F. App'x at 140; *Alam*, 960 F.3d at 835–36; *Raia*, 954 F.3d at 597;

*see also Valentine v. Collier*, 956 F.3d 797, 805 (5th Cir. 2020) (per curiam) (rejecting COVID-19

as a ground for waiver of the PLRA's statutory exhaustion requirement).  Indeed, "[t]he seriousness

of COVID-19 and its spread in many prisons make it all the more imperative that the prisons have

authority to process these applications fairly and with due regard for the seriousness of each

inmate's risk."  *Alam*, 960 F.3d at 836.  By contrast, "[f]ree-floating exceptions to the rule, available

to anyone willing to go to federal court first, will not help that cause."  *Id*.  Because BOP and its

inmates have a "shared desire for a safe and healthy prison environment," "strict compliance with

§ 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."  *Raia*, 954

F.3d at 597.

Courts in this district have agreed that "the mere existence of COVID-19 among the prison

population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion

requirement under § 3582(c)(1)(A)."  *United States v. Feiling*, 453 F. Supp. 3d 832, 838 (E.D. Va.

2020); *see also*, *e.g.*, *United States v. White*, No. 2:07-cr-150, 2020 WL 1906845, at *1 (E.D. Va.

Apr. 17, 2020); Order at 4, *United States v. Adams*, No. 1:88-CR-46 (TSE) (E.D. Va. Apr. 17,

2020), ECF No. 32 (Section "3582(c)(1)(A)'s exhaustion requirements must still be complied with,

even in light of COVID-19."); *but see Coleman v. United States*, 465 F. Supp. 3d 543, 548 (E.D.

Va. 2020) (finding that waiver of the exhaustion requirement was "necessary for timely judicial

review of compassionate release motions during the COVID-19 pandemic").

b. Pursuing defendant's request with BOP would not be futile.

The defendant asks the Court to waive the exhaustion requirement, arguing that it would be

futile to seek relief with BOP.  However, the Supreme Court has instructed, that courts "will not

read futility or other exceptions into statutory exhaustion requirements where Congress has

provided otherwise."  *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001); *see United States v. Mejia*,

671 F. App'x 161, 161–62 (4th Cir. 2016). Futility "as a ground for excusing exhaustion of

administrative remedies is generally applied where the remedy, while technically available, is

14

practically speaking, incapable of use." *United States v. Carr*, No. 1:13CR34-1, 2020 WL 2847633, at *4 (W.D. Va. June 2, 2020).  The defendant does not explain how the Court can "divine" whether BOP "may wish to act on any given petition" or why the Court must "assume" that BOP's "failure to act would render the act of waiting 'futile.'" *Alam*, 960 F.3d 835.

By itself, the unprecedented nature of the coronavirus pandemic does not establish that requiring the defendant to exhaust his administrative remedies would be futile.  *See Feiling*, 453 F. Supp. 3d 839 ("Because Defendant argues that the exhaustion requirement should be waived due solely to the COVID-19 outbreak and his susceptibility to it, he has failed to demonstrate the futility of exhaustion in this instance."); *see also United States v. Mattingley*, No. 6:15-cr-5, 2020 WL 2542873, at *3 (W.D. Va. Apr. 1, 2020) ("[G]iven that section 3582(c)(1)(A) is a statutory exhaustion requirement, rather than a judge-made requirement, the Court is constrained from reading in exigency as excusing exhaustion from the plain language of the statute.").

c. Pursuing defendant's request with BOP would not cause undue prejudice.

The defendant asserts that requiring him to exhaust his administrative remedies with BOP would subject him to undue prejudice such that waiver is appropriate.  The Supreme Court has made clear, however, that equitable considerations may justify excusing judge-made exhaustion requirements, but not statutory requirements.  *See Ross*, 136 S. Ct. at 1857 (explaining that statutory exhaustion provisions "stand on a different footing" from "judge-made exhaustion doctrines," and that "courts have a role in creating exceptions" to statutory requirements "only if Congress wants them to").  Nor has the defendant established that he "will suffer irreparable injury or other undue prejudice if required to pursue his administrative remedies."  *United States v. Fantz*, No. 5:14-CR-32-BR, 2020 WL 3492028, at *2 (E.D.N.C. June 26, 2020) (finding that the defendant's "personal circumstances [did] not justify setting aside the exhaustion requirement"); *see United States v. Robinson*, No. 6:03-616-HMH, 2020 WL 3071939, at *5 (D.S.C. June 10, 2020) (finding, "based on the record," that there was "no evidence of any undue prejudice" to the defendant in requiring exhaustion).

15

Finally, requiring exhaustion "comports" with "BOP's overall position within the criminal justice system." *Feiling*, 453 F. Supp. 3d at 840.  Exhaustion language "demonstrates Congress's intent that the BOP makes an initial determination about whether an inmate qualifies for a reduced sentence." *Id.*  Further, "as the agency most familiar with an inmate's characteristics, prison conditions and other relevant factors," BOP "stands in the best position to determine an inmate's suitability for release." *Id.*; *see also United States v. Funderbunk*, CR No. 5:17-113, 2020 WL 3001669, at *2 (S.D. W. Va. June 4, 2020) ("The agency's expertise and access to necessary information about defendants makes it uniquely situated to handle compassionate release decisions.").  To that end, BOP carefully reviews and considers requests for compassionate release.[7] Requiring BOP to evaluate requests for compassionate release in the first instance promotes consistency in assessing the health and safety needs of prison facilities as a whole.  *See Montanez*, 458 F. Supp. 3d at 156 ("The BOP is in the best position right now to consistently evaluate prisoners in its facilities to ensure that similarly situated prisoners are receiving consistent results, while simultaneously protecting the welfare of all prisoners (not just those suitable for sentence reduction pursuant to Section 3582(c)(1)(A))."). To accept the defendant's position and "ignore Congress's clear directive that inmates seek resolution with BOP prior to seeking relief from the federal courts" would "usurp the role that Congress provided the BOP to consider the availability of compassionate release to inmates in the first instance." *Mattingley*, 2020 WL 2542873, at *3.

The defendant has not complied with § 3582(c)(1)(A)'s mandatory exhaustion requirement and, even if this Court determines that it can waive that requirement, the defendant has not established any circumstance warranting waiver in this case.  Therefore, the Court should dismiss this motion as premature.

---

[7] *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) (Jan. 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

**D.**     **The defendant has failed to establish an extraordinary and compelling reason for compassionate release.**

The defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate release because his medical conditions do not make him particularly susceptible to COVID-19 and he has not established a particularized risk of contracting COVID-19 at his facility.

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."  Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release," the Sentencing Commission has "addressed the issue in a policy statement."  *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by BOP.  U.S.S.G. § 1B1.13.  If a district court finds that extraordinary and compelling reasons exist, the court may not reduce a sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable." § 3582(c)(1)(A).  The defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A).  *United States v. Weaver*, No. 1:17-CR-235, 2020 WL 4810123, at *2 (E.D. Va. Aug. 18, 2020); *see United States v. Morgan*, 473 F. Supp. 3d 544, 547 (D.S.C. 2020); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).

The Fourth Circuit's recent decision in *McCoy* does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A).  In *McCoy*, the court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A).  981 F.3d at 281–82.  Because § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by BOP, the court reasoned that the policy statement does not apply to motions brought by defendants.  *Id.* at 282.  Absent an applicable policy statement, district courts should "make their

own independent determinations of what constitutes an 'extraordinary and compelling reason[]'

under § 3582(c)(1)(A), as consistent with the statutory language." *Id*. at 284.  The Fourth Circuit

noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by

defendants." *Id*. at 282 n.7 (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)

(observing that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and

its Application Notes provide a working definition of 'extraordinary and compelling reasons'" and

that "a judge who strikes off on a different path risks an appellate holding that judicial discretion

has been abused," such that the policy statement "can guide discretion without being conclusive")).

Accordingly, the Fourth Circuit has continued to reference § 1B1.13 as a guidepost for

compassionate release motions even after *McCoy*.  *See, e.g.*, *United States v. Trotman*, No. 20-6217,

2020 WL 7392287, at *2 (4th Cir. Dec. 17, 2020) (per curiam); *United States v. Adamson*, 831 F.

App'x 82, 83 (4th Cir. 2020) (per curiam).  Courts in this district have followed suit.  *See, e.g.*,

*United States v. Nabaya*, No. 3:17cr3, 2021 WL 54361, at *6 (E.D. Va. Jan. 6, 2021); *United States

v. Prater*, No. 3:13cr133 (DJN), 2021 WL 54364, at *3 (E.D. Va. Jan. 6, 2021); *Perkins v. United

States*, No. 2:18-cr-177, 2020 WL 7364222, at *2 (E.D. Va. Dec. 15, 2020); *United States v. Reid*,

No. 2:02cr172-7, 2020 WL 7318266, at *2 (E.D. Va. Dec. 10, 2020).

      Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for

compassionate release.  *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at *3

(5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*,

954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may

spread to a particular prison alone cannot independently justify compassionate release ...."); *see

United States v. Miller*, No. 3:16cr121, 2020 WL 4547809, at *5 (E.D. Va. Aug. 6, 2020)

(Defendant "cannot rely merely on a fear of contracting COVID-19 as grounds for compassionate

release."  (internal quotation marks omitted)); *United States v. Day*, 474 F. Supp. 3d 790, 805 (E.D.

Va. 2020) ("[W]hile the global health crisis is no doubt extraordinary, it affects all prisoners; and

the risk of being infected by COVID-19, standing alone, fails to justify an inmate's compassionate

release."); *Feiling*, 453 F. Supp. 3d at 842 ("[T]he threat of COVID-19 exists both in- and outside

of prison walls, and Defendant's fear of contracting COVID-19 cannot justify his release.").

"Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not

provide an extraordinary and compelling reason for a defendant's release." *United States v.*

*Chandler*, No. 3:15mj122( (DJN), 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020); *see also*

*United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *5 (E.D. Va. Aug. 31, 2020) ("[A]

'fear' of contracting COVID-19[] … will not suffice as an 'extraordinary and compelling' reason

for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)."). Instead, "[i]n the context of the

COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate

release when an inmate shows both a particularized susceptibility to the disease and a particularized

risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83 (quoting *Feiling*,

453 F. Supp. 3d at 841); *see United States v. Blevins*, No. 20-7053, 2020 WL 7691726, at *1 (4th

Cir. Dec. 28, 2020) (per curiam).

### E.     The defendant has not demonstrated that he faces a particularized susceptibility to COVID-19.

The defendant has not established an extraordinary and compelling reason for

compassionate release because he has not shown that he faces a "particularized susceptibility" to

COVID-19. In his motion, the defendant, who is 41 years old, asserts that he is obese and also

suffers from diabetes (Type II), high blood pressure, and high cholesterol. He argues that these

conditions place him at risk of developing severe symptoms if he contracts the coronavirus.

Addressing the defendant's age and these purported ailments one at a time below, the United States

will demonstrate that the defendant is not entitled to relief under § 3582(c)(1)(A) because all of his

health conditions are being well managed by BOP medical staff, therefore they do not place him at

an increased risk of severe illness from COVID-19.

#### (i). <u>The defendant is under age 65</u>.

The CDC has recognized that the "[r]isk for severe illness with COVID-19 increases with

age, with older adults [being] at highest risk."[8]  However, the defendant's age, by itself, does not

"create a materially elevated risk of hospitalization or death due to COVID-19."  *United States v.*

*Lumpkin*, No. 2:12cr192, 2020 WL 7123109, at *2 (E.D. Va. Dec. 4, 2020) (43-year-old defendant

was not particularly susceptible to COVID-19); *see also, e.g.*, *United States v. Dunlap*, No. PJM 01-

97, 2020 WL 5096723, at*4 (D. Md. Aug. 28, 2020).  In this case, the defendant, a 41-year-old

man, has not established that his age puts him at increased risk for severe illness from COVID-19.

### (ii). <u>The defendant is not presently suffering from Type 2 diabetes.</u>

"To establish a particularized susceptibility to COVID-19, courts have required defendants

to provide evidence that they suffer from a medical condition identified by the [CDC] as a COVID-

19 risk factor."  *Chandler*, 2020 WL 6139945, at *5.  The defendant asserts that he suffers from

Type 2 diabetes, but his medical records only refer to a "history" of diabetes, and he is not currently

prescribed any medication for such a condition.[9]  On September 15, 2020, during a routine health

evaluation, Dr. L. Berrios noted that the defendant had a "history of diabetes," but had "no

medications and no complaints at this time." Exhibit 1, p. 5.  A lab test conducted that day showed

the defendant's blood glucose level was 90 milligrams per deciliter (mg/dL). According to the

Mayo Clinic, a random blood sugar test that reflects greater than 200 mg/dL suggests diabetes,

regardless of when the individual last ate. https://www.mayoclinic.org/diseases-conditions/type-2-

diabetes/diagnosis-treatment/drc-20351199.  During the same visit, the defendant's vital signs were

within normal limits and Dr. Berrios noted that "education [was] given about diet, exercise and

plan" and the defendant "understood." *Id.*, at pp. 5-7. In fact, on May 19, 2019, Dr. Richard Griffin

noted that the defendant's "DM labs were normal" therefore the defendant "[did] not have DM"

meaning diabetes mellitus. Dr. Griffin also recommended that the defendant be removed from the

---

[8] *Older Adults*, CDC (Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/adults.html.
[9] In 2018 the defendant was prescribed metformin for his diabetes, but the prescription was discontinued on January 28, 2019 because his diabetes was "in remission," and "stable."  Exhibit 1, p. 51.

"CCC" (Chronic Care Clinic) a result. Exhibit 1, p. 7. Subsequent lab tests showed the defendant's blood glucose within normal limits as well: on June 19, 2019 it was 83 mg/dL, and on September 26, 2019, it was 88 mg/dL. Exhibit 1, pp. 38 and 3, respectively. Finally, during a Health Screen conducted on September 25, 2019, the defendant denied having diabetes. Exhibit 1, p. 12.

(iii). **The defendant has not been diagnosed as obese**.

On December 15, 2020, the defendant was 6 feet tall and weighed 216.8 pounds. Exhibit 2, p. 5. The defendant's height and weight place his body mass index (BMI) at 29.4,[10] therefore he does not fall into the CDC's definition of obesity (individuals with a BMI between 30 and 40) that would place him at an increased risk of serious illness associated with COVID-19.[11]  While the defendant's weight has been a topic of discussion during visits with health care providers at BOP, his medical records do not show any diagnosis of obesity. On December 15-16 2020, the defendant was seen by two nurse practitioners because he was complaining of abdominal pain. During the consultation on December 16, 2020, the defendant admitted he had been "eating a lot of spicy, fatty foods, especially chips." During this visit, the defendant's vital signs were assessed, and all were within normal limits. Exhibit 2, p. 3. On September 15, 2020, during a routine health evaluation, BOP Dr. L. Berrios noted that the defendant who weighed 215 pounds, was controlling his hyperlipidemia with diet and exercise, and had "no complaints at this time."  Exhibit 1, p. 5. During the visit, the defendant's vital signs were within normal limits and Dr. Berrios noted that "education [was] given about diet, exercise and plan" and the defendant "understood." *Id*., at pp. 5-7.

Assuming *arguendo* the defendant is borderline obese, the CDC classifies obesity as a risk factor, "albeit one that is not a permanent condition."  *United States v. Johns*, No. 2:15cr24, 2020

---

[10] https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.html.

[11] *See People with Certain Medical Conditions*, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus /2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https %3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

WL 6544385, at *1 (E.D. Va. Nov. 5, 2020) (finding that the defendant was not entitled to

compassionate release based on his asserted prediabetes, hypertension, and obesity); *see also, e.g.*,

*United States v. Moody*, No. 1:02-cr-4-MR-4, 2020 WL 3433132, at *3 (W.D.N.C. June 23, 2020)

(observing that the defendant had not shown that his history of smoking or other conditions were

"terminal or substantially diminish[ed] his ability to provide self-care while in prison"). Here, the

defendant has been counseled numerous times by BOP medical staff about diet and exercise, yet he

continues to indulge in "spicy, fatty foods, especially chips." His weight could certainly be better

controlled if he took his doctors' advice, yet he appears unwilling to do so.

In summary, the defendant may be marginally overweight, but he has not been diagnosed as

obese. Therefore, he does not meet the CDC's guidelines for being at increased risk of serious

illness from COVID-19 based on obesity.

### (iv).   **The defendant's high blood pressure and high cholesterol are being well managed and therefore do not place him at an increased risk of severe illness from COVID-19.**

In its guidance concerning medical conditions that pose an increased risk due to COVID-19,

the CDC distinguishes between individuals who "are at increased risk" and those who "might be at

an increased risk" for severe illness from the virus. *See* footnote 9, *infra*. According to the CDC,

individuals with high blood pressure "might be at an increased risk for severe illness" from COVID-

19, but high cholesterol is not on that list. *Id.*  For this reason, "courts have found that certain

conditions … do not constitute an extraordinary or compelling reason for compassionate release,

absent some evidence of a diminution in the defendant's health."  *Prater*, 2021 WL 54364, at *5.

Where the defendant is receiving medical treatment to manage his hypertension, courts have found

that this condition does not establish a particularized susceptibility to COVID-19.  *See, e.g.*, *Reid*,

2020 WL 7318266, at *2; *Barrett v. United States*, No. 4:15-cr-47-1, 2020 WL 6206008, at *3

(E.D. Va. Oct. 22, 2020).] Here, there is no evidence of "a diminution in the defendant's health,"

and his high blood pressure and cholesterol are being well managed by BOP medical staff. The

defendant was prescribed lisinopril for his high blood pressure and atorvastatin for high cholesterol.

Exhibit 1, pp. 17, 29. However, on several medical visits, the defendant admitted that he was not taking the lisinopril. *See, e.g.*, Exhibit 1, p. 17. And on September 15, 2020, Dr. L. Berrios noted that the defendant had a "history of hyperlipidemia" that was being "diet controlled," and the patient had "no complaints at [that] time." Exhibit 2, p. 5.

In summary, the defendant has not established extraordinary and compelling reasons for compassionate release based on having high blood pressure and high cholesterol, mainly because the two conditions are well under control according to his medical records.

**F.     The defendant has not demonstrated that he faces a particularized risk of contracting COVID-19 at Yazoo City Low FCI.**

Even if the Court determines that the defendant suffers from a medical condition that makes him particularly susceptible to COVID-19, he has not established an "extraordinary and compelling" reason for compassionate release because he has not shown any "particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83; *see, e.g.*, *United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *4-*5 (E.D. Va. Aug. 31, 2020) (finding that the defendant's underlying medical conditions were "extraordinary and compelling" but that she did not face a particularized risk of contracting COVID-19 at her facility).

Courts have required that a defendant's particularized risk "be supported by evidence of an actual outbreak in his facility, not simply the mere possibility of COVID-19 spreading to his camp." *United States v. Little*, No. 1:10-cr-135, 2020 WL 3442173, at *2 (E.D.Va. June 23, 2020); *see also, e.g.*, *Beahm*, 2020 WL 4514590, at *2.  Currently, Yazoo City FCI Low has a total of 1,377 inmates.  As of January 28, 2021, 2 inmates and 5 staff members are currently positive for COVID-19, and 83 inmates and 9 staff members have recovered after testing positive.  Vaccines have been made available to staff and some of the more vulnerable inmates at Yazoo City Low, and the facility plans to continue inoculating as many inmates and staff as possible. Thus, defendant has not established any "inadequacies" relating to Yazoo City's "protocols," much less "how those inadequacies jeopardize his health." *United States v. Bryant*, No. 4:19cr47-10(DJN), 2020 WL

23

7497805, at *5 (E.D. Va. Dec. 21, 2020).

Yazoo City Low continues to follow BOP's modified operations plan during the COVID-19 emergency. These mitigation efforts reinforce that the defendant does not face a particularized risk at his facility. *See, e.g.*, *Beahm*, 2020 WL 4514590, at *2 (noting BOP efforts to contain the spread of COVID-19, including "limiting access to prisons, restricting prisoner movements within prisons, using screening and testing, educating inmates and staff on preventing the spread of disease, providing masks and hand cleaners, and separating ill inmates").

### G. The defendant's release plan would not lower his risk of contracting COVID-19.

The defendant's current incarceration does not present a particularized risk of contracting COVID-19 because he has failed to demonstrate that his release plan would decrease his likelihood of contracting the virus outside Yazoo City Low FCI. If released, the defendant plans to live with his 61-year-old mother in Norfolk, Virginia.[12] Norfolk currently has 12,549 positive cases of COVID-19. https://coronavirus.1point3acres.com/en (as of January 28, 2021). With a population of 244,601, Norfolk currently has a 5% infection rate. With an inmate population of 1,377, Yazoo City Low FCI has two positive cases amongst inmates, showing a .1% infection rate. Clearly, defendant faces a higher risk of contracting COVID-19 in Norfolk than he does at Yazoo City Low FCI. *See United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *2 (E.D. Va. Dec. 11, 2020) (finding that the defendant's release plan did not lower his risk of infection where "he would be living in a county with a significant number of positive COVID-19 cases"); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) (finding it was "not clear" that the defendant "would be safer from the virus on home confinement" where "the number of cases in Richmond, Virginia—where Defendant would be released on home confinement—far exceed[ed] the number of cases in Petersburg, Virginia").]

---

[12] The defendant does not provide a current address for his mother, but only identifies that she lives in Norfolk.

The defendant's release plan "would not necessarily be any safer for him because he would be released to a home that does not follow the strict procedures laid out in the BOP's modified operations plan." *Watson*, 2020 WL 7318269, at *2; *see Feiling*, 453 F. Supp. 3d at 842 ("[A]lthough Defendant argues that home confinement would allow him to better mitigate his exposure to COVID-19, the same can be said of keeping Defendant in prison, where the BOP has already taken steps to isolate prison facilities from internal and external sources of the coronavirus."). Additionally, releasing the defendant "might expose others to the dangers of COVID-19 because he would need to interact with his family, his probation officer, and other members of the community." *Id.* Indeed, if released, the defendant proposes to live with his 61-year-old mother who is at higher risk for severe illness from COVID-19 due to her age alone. Defendant does not provide any information about his mother's health status, but she appears to be unable to work, relying on disability benefits for her income. PSR ¶49. Thus, releasing the defendant to live with his mother "would presumably compound the risks" to her health by requiring her "to go out into society and interact with others to obtain necessities." *Feiling*, 453 F. Supp. 3d at 842; *see also, e.g.*, *White*, 2020 WL 3442171, at *6 (observing that the defendant's release plan would impose risks on his "77-year-old mother, who [] offered to house him upon his release despite her own medical problems").]

Because the defendant has not established a particularized risk of contracting COVID-19 at his facility, he is not entitled to compassionate release under § 3582(c)(1)(A).

**H.    The Court should deny the defendant's motion because the statutory sentencing factors do not support release.**

Even if the Court determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release. Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the underlying offense and the history and

characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." Further, the Sentencing Commission policy statement, U.S.S.G. § 1B1.13, instructs courts to consider the factors set forth in 18 U.S.C. § 3142(g), including "the nature and circumstances of the offense charged …; the history and characteristics of the person …; [and] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *Prater*, 2021 WL 54364, at \*4 (citing U.S.S.G. § 1B1.13, application note 3). In this case, the relevant statutory sentencing factors do not support compassionate release.

    **(i).**  **<u>Seriousness of offense and danger to the community</u>**

The seriousness of the defendant's offense weighs heavily against release. Courts in this district consistently have denied compassionate release based on the seriousness of the defendant's offense. *Reid*, 2020 WL 7318266, at \*3 (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); *Albury v. United States*, No. 2:19-cr-68, 2020 WL 6779643, at \*5 (E.D. Va. Oct. 23, 2020) (finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs").

In the instant case, the defendant was involved in obtaining and distributing over 19 kilograms of cocaine, over 19 kilograms of marijuana, and several ounces of heroin over a two year period. If broken down into a "useable" quantity of one gram, the cocaine alone represents 19,000 "doses" that were dispersed into the local community. The gravity of the defendant's criminal activity is increased exponentially by the fact that he was on court supervision during the entire time

he was committing these offenses. His activity posed a significant danger to the community and his utter lack of respect for the court's authority heightens the seriousness of his crimes. All of these factors weigh heavily against early release.

    **(ii).** **Criminal history, disciplinary record, and the need for deterrence**

The defendant's criminal history underscores that the statutory sentencing factors do not support his request for release.  Dating back to 1992, when he was 13 year old, the defendant's criminal record spans almost 30 years, and includes convictions for unlawful wounding in 1998, three convictions for drug distribution (1996, 2001, and 2003), and numerous probation violations. The defendant "presents a serious threat to the public" because he qualifies as a career offender based on his three prior convictions for narcotics distribution.  *United States v. Harris*, No. 3:11cr156, 2020 WL 7646633, at *5 (E.D. Va. Dec. 23, 2020).  While incarcerated, the defendant incurred numerous disciplinary infractions, including Disruptive Conduct (April 12, 2019), Possession of Gambling Paraphernalia (September 18, 2017), Phone Abuse (December 13, 2015), Sexual Acts (June 19, 2005), Gambling Paraphernalia (December 5, 2004), and Phone Abuse (March 20, 2003). *See* Exhibit 4.

Further, the defendant presents a "serious" risk of recidivism given that he committed the instant offenses after serving a significant sentence in federal prison for the same type of conduct, namely, drug dealing.  *Prater*, 2021 WL 54364, at *6; *see also, e.g.*, *Bryant*, 2020 WL 7497805, at *6 (reasoning that the defendant "present[ed] a recidivism risk, as evidenced by the fact that he violated the conditions of his pretrial release and consistently failed to comply with drug testing requirements"); *United States v. Booth*, No. 3:15cr56, 2020 WL 6361935, at *4 (E.D. Va. Oct. 29, 2020) (finding that the defendant "present[ed] a danger both to himself and the community" because he had several prior larceny convictions at the time he committed the underlying offense); *Chandler*, 2020 WL 6139945, at *6 (finding that the § 3553(a) factors did not support release where the defendant had an "extensive criminal history, which started at age 15" and included "multiple theft-related offenses" and "several violent offenses").

Finally, the defendant's prior felony convictions, and the fact that he committed his drug-trafficking crimes while on a term of supervision imposed by the federal and state courts, demonstrates lack of respect for the law and the need for specific deterrence. These circumstances do not weigh in favor of early release. Releasing the defendant two years early would minimize the seriousness of the defendant's misconduct and send the wrong message to the defendant and to similarly situated offenders. *See, e.g., United States v. Bogdanoff*, 459 F. Supp. 3d 653, 659 (E.D. Pa. May 8, 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence); *Albury*, 2020 WL 6779643, at *5 (denying compassionate release based on defendant's "demonstrated history of not only disobeying court rules but also of committing more crimes during his supervised release"). "The need for continued deterrence of such misconduct weighs against" the defendant's request for compassionate release. *Nabaya*, 2021 WL 54361, at *6.

### (iii). <u>Rehabilitation efforts</u>

The defendant asserts that he has made significant progress and rehabilitation through his current prison term. Specifically, he has taken several education and vocational courses, and completed a drug program since his return to federal prison in 2013. *See* Exhibit 5. To be sure, his rehabilitative efforts are commendable, however, many of the courses listed in his educational transcript were taken during the defendant's previous visit to federal prison between 2002-2011. Unfortunately, those rehabilitative efforts did not steer the defendant in the right direction upon his release in 2011 because he immediately began selling narcotics once again, as evidence by the offense conduct in the instant case. "Congress [has] made clear that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason'" for release. *Hill*, 2020 WL 6049912, at *5 (quoting 28 U.S.C. § 994(t)). Consequently, the defendant's efforts at rehabilitation do not outweigh the seriousness of his crime, his extensive criminal history and his propensity for recidivism. *See, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to

28

tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.").

### (iv). Protecting the public

Courts in this district have required the defendant to bear the burden of proving that his release plan will not pose a danger to the public. *See, e.g.*, *Miller*, 2020 WL 4547809, at *6 (finding that the defendant had "not done enough to establish that he [would] not be a danger to society if released" based on his "criminal history, BOP records, and seeming inability to follow court orders, combined with the fact that his proposed release plan [did] not include any plan for ensuring that he [would] follow such orders and rules if granted release"); *Beahm*, 2020 WL 4514590, at *3 ("As the party seeking relief and with no statutory guidance otherwise, Defendant bears the burden to prove that he is entitled to compassionate release.").

If released, the defendant proposes to live with his 61-year-old mother in Norfolk, Virginia. The defendant's plan does not adequately protect against recidivism because he would be living in the same city where he committed the underlying offenses, and with the same family member he was living with when he committed them. *See, e.g., Holloman v. United States*, No. 4:14-CR-68, 2020 WL 5913995, at *3 (E.D. Va. Oct. 6, 2020) (expressing concern that defendant's "release plan does not adequately protect the public" where his plan "would have him return to his parents' home—the same location in which the initial offense occurred").

Based on the above analysis under § 3553(a), the Court should deny the defendant's motion because the statutory sentencing factors weigh heavily against early release.

## IV. CONCLUSION

For the foregoing reasons, this Honorable Court should deny the defendant's motion for compassionate release. In the alternative, if the Court determines that the defendant is entitled to compassionate release, the Court should require the defendant to complete a 14-day quarantine

controlled by BOP prior to his release.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:  _____/s/_____
Sherrie S. Capotosto
Assistant United States Attorney
Virginia State Bar No. 33127
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Ph: (757) 441-6331
Fax: (757) 441-6689
Sherrie.Capotosto@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system. I also mailed a copy of the foregoing to the following non-

filing user: Keith Jermaine Everett, #54447-083, Yazoo City FCI Low, 2225 Haley Barbour

Parkway, Yazoo City, Mississippi  39194.

_____/s/_____
Sherrie S. Capotosto
Assistant United States Attorney
Virginia State Bar No. 33127
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Ph: (757) 441-6331
Fax: (757) 441-6689
Sherrie.Capotosto@usdoj.gov

30